| **Collazo v Gulmatico** |
|:---:|
| 2024 NY Slip Op 33096(U) |
| September 4, 2024 |
| Supreme Court, Kings County |
| Docket Number: Index No. 505790/2021 |
| Judge: Consuelo Mallafre Melendez |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

**At an IAS Term, Part 15 of the Supreme Court of the State of NY, held in and for the County of Kings, at the Courthouse, at 360 Adams Street, Brooklyn, New York, on the 4th day of September 2024.**

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF KINGS

-------------------------------------------------------------------------X

ANDRES COLLAZO and AMELIA COLLAZO,

      Plaintiffs,

  -against-

CONSTANTINO GULMATICO, M.D., WIGBERT S. GODOY, M.D., UMUT SARPEL, M.D., KUSUMA NIO, M.D., MOUNT SINAI BROOKLYN HOSPITAL and MOUNT SINAI ST. LUKES HOSPITAL,

      Defendants.

-------------------------------------------------------------------------X

**DECISION & ORDER**

Index No. 505790/2021
Mo. Seq. 3, 4 & 5

**HON. CONSUELO MALLAFRE MELENDEZ, J.S.C**.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:

NYSCEF #s:  Seq.3: 99 – 101, 102 – 116, 117 – 118, 165, 166 – 168, 169, 182 – 183
                 Seq. 4: 119 – 121, 122 – 135, 170, 171 – 173, 174, 184 – 185, 186
                 Seq. 5: 136 – 137, 138 – 159, 160 – 161, 175, 176 – 178, 179, 187 – 188

Defendant Constantino Gulmatico, M.D. ("Dr. Gulmatico"), moves (Seq. No. 3) for an Order, pursuant to CPLR 3212, granting summary judgment in his favor, or granting partial summary judgment and a limitation of the triable issues.

Defendants Wigbert S. Godoy, M.D. ("Dr. Godoy") and Beth Israel Medical Center s/h/a Mount Sinai Brooklyn Hospital ("Mount Sinai Brooklyn"; and together, "MSB Defendants") separately move (Seq. No. 4) for an order, pursuant to CPLR 3212, granting summary judgment in their favor, dismissing Plaintiffs' complaint against them, and amending the caption to remove them from the action.

Defendants Umut Sarpel, M.D. ("Dr. Sarpel"), Kusuma Nio, M.D. ("Dr. Nio"), and Mount Sinai Morningside s/h/a Mount Sinai St. Lukes Hospital ("Mount Sinai Morningside"; and together, "Morningside Defendants") separately move (Seq. No. 5) for an order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing Plaintiffs' complaint against them.

Plaintiffs oppose all three motions as to all Defendants.

1

[* 1]

Plaintiffs commenced this action on March 11, 2021, asserting claims of medical malpractice and lack of informed consent in connection with treatment and care rendered to Andres Collazo ("Mr. Collazo" or "the patient") from July 23, 2020 to August 12, 2020, including a surgery which took place on July 24 at Mount Sinai Brooklyn and two follow-up surgeries at Mount Sinai Morningside. Co-plaintiff Amelia Collazo also asserts a loss of services claim.

Mr. Collazo, then 62 years old, was admitted to Mount Sinai Brooklyn from the emergency department on July 23, 2020, with symptoms including epigastric/abdominal pain and elevated white blood cell count. An abdominal CT scan showed acute calculous cholecystitis (inflammation of gallbladder) and a gallstone measuring 1 cm. After admission to the medical floor, he was treated by attending physician Abdo Balikcioglu, M.D. ("Dr. Balikcioglu"), surgical consult Dr. Gulmatico, and cardiology consult Augusto Paiusco, M.D. ("Dr. Paiusco"), among others. Dr. Paiusco, the cardiologist, evaluated him as "intermediate risk" overall for surgery and recommended withholding Plavix, a blood thinner he was prescribed for prior cardiovascular disease.

On July 24, 2020, at 4:51 p.m., Dr. Gulmatico performed a laparoscopic cholecystectomy (gallbladder removal) as the primary surgeon, with assistance from general surgeon Wigbert Godoy, M.D. ("Dr. Godoy"). Dr. Gulmatico authored an operative report following the surgery on July 24, in which he reported that the gallbladder was initially covered with the omentum, and there was some oozing from the gallbladder bed after dissection which was "controlled using electrocautery." He placed a Jackson-Pratt drain to collect fluid. He recorded the patient was "fairly stable" after a relatively "unremarkable" procedure. Dr. Gulmatico also authored a second operative report on July 30 with more detail. Dr. Godoy's role in the surgery, according to operative reports and testimony of the doctors, was limited to placing trocars, holding graspers and sutures, and maneuvering the camera.

The patient remained at Mount Sinai Brooklyn for post-operative monitoring through July 28, 2020. In the days following the surgery, he had serosanguinous drainage in the Jackson-Pratt drain without gross blood. He was restarted on Plavix by cardiologist Dr. Paiusco on July 26. Dr. Gulmatico examined the patient on July 27, noting his abdomen was "soft, non-distended [with] minimal trocar site tenderness," and cleared him for

2

discharge pending evaluation by the cardiologist. Dr. Paiusco examined him on July 28, noting elevated troponin but assessing him as stable for discharge. He was discharged home by attending physician Dr. Balikcioglu around 2:30 p.m.

The following morning at approximately 8:30 a.m., the patient returned to Mount Sinai Brooklyn with acute onset abdominal pain. He was admitted to the ICU at 11:39 a.m. A CT scan of the abdomen and pelvis revealed a large amount of blood. At 2:35 p.m., a CT angiogram was performed but "failed to demonstrate [the] source of bleeding" (Mount Sinai Brooklyn July 29 records, at 11). He received three blood transfusions. He was examined by Dr. Gulmatico at 7:15 p.m. and ultimately transferred to Mount Sinai Morningside "for further close monitoring and to have interventional radiology and possible embolization of the site of bleeding, if necessary." He was diagnosed with "post-op intra-abdominal hematoma."

On July 29, the patient arrived at Mount Sinai Morningside ICU at 7:49 p.m. General surgeon Dr. Nio co-signed a resident's note to "closely monitor vitals" and perform serial blood tests, and to proceed to exploratory surgery if his condition worsened.

On July 30, Dr. Nio noted his dropping hematocrit and worsened transaminitis (liver enzymes) and brought the patient to the operating room. Dr. Nio performed a laparoscopy, which was converted to an open laparotomy, and liver specialist Dr. Sarpel took over this portion of the surgery. The procedure revealed a large amount of blood around the liver and spleen and a "large subcapsular hematoma at segment VI of the liver." According to the operative report, after surgically removing or "deroofing" the hematoma, "there was a large liver laceration with active bleeding." The active bleeding was controlled, but the patient became hemodynamically unstable and had to be transferred to the SICU with an open abdomen and temporary packing. Dr. Sarpel's operative report similarly stated that "the hematoma was unroofed and we exposed the underlying hepatic parenchyma. There was a laceration in the liver within which there was active bleeding from a branch of an hepatic vein."

The following day, July 31, Dr. Nio performed a third surgery to remove the packing and close the abdomen. Some "minimal oozing from segment VI of the liver" was cauterized. The patient was placed on a

3

[* 3]

mechanical ventilator due to respiratory complications following this operation, and he was extubated on August 3, 2020. An echocardiogram and his troponin levels indicated that he had suffered either a type II or type I myocardial infarction. The patient was discharged from Mount Sinai Morningside on August 12, 2020.

The patient returned to Mount Sinai Morningside on August 14 and underwent additional treatment for a transverse colon ulcer.

Plaintiffs allege that the patient's liver laceration, subcapsular hematoma, and subsequent hemodynamic instability and cardiovascular complications were proximately caused by departures from the standard of care at Mount Sinai Brooklyn during and after the July 24 surgery. Plaintiffs also allege that the Mount Sinai Morningside defendants proximately caused his hemodynamic and cardiac complications by delaying diagnosis and proper surgery from July 29-30.

"In determining a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party" (*Stukas v Streiter,* 83 AD3d 18, 22 [2d Dept 2011]). In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department:

> "The elements of a medical malpractice cause of action are a deviation or departure from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries. When moving for summary judgment, a defendant provider has the burden of establishing the absence of any departure from good and accepted medical practice or that the plaintiff was not injured thereby. In order to sustain this burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's bill of particulars. In opposition, the plaintiff must demonstrate the existence of a triable issue of fact as to the elements on which the defendant has met his or her initial burden. General allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat a defendant's summary judgment motion. Although summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions, expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (*Barnaman v Bishop Hucles Episcopal Nursing Home,* 213 AD3d 896, 898-899 [2d Dept 2023] [internal quotation marks and citations omitted].

4

In support of Dr. Gulmatico's summary judgment motion (Seq. No. 3), the movant submits an expert affirmation from Michael G. Persico, M.D. ("Dr. Persico"), a licensed physician certified in surgery, as well as medical records and deposition transcripts.

Based on the record and his expertise, Dr. Persico opines that there were no departures from the standard of care in Dr. Gulmatico's performance of the July 24 surgery or any pre- or post-operative treatment. Specifically, Dr. Persico opines that the decision to perform a laparoscopic cholecystectomy was appropriate, given the patient's symptoms and history ("two prior bouts of cholecystitis") and his risk assessment and "clearance" from the cardiology consult.

Dr. Persico opines that the bleeding or oozing from the liver bed during surgery was "not unusual" and it was appropriately cauterized by Dr. Gulmatico. The expert opines that the patient's post-operative hematoma complication was "due to bleeding from a vein in the liver" and had no connection to this intraoperative bleed.

Following the surgery, Dr. Persico opines that Dr. Gulmatico was "not made aware" of the patient's H&H levels which had dropped to 9.9 and 30.9 on the date of his discharge, and those values nonetheless "did not require investigation or keeping the patient in the hospital since he was doing well clinically." Dr. Persico opines that this was a "slight and insignificant drop" after multiple "stable blood counts," which did not indicate an active bleed.

Dr. Perisco further opines that there was no reason not to discharge the patient on July 28. He opines that Dr. Gulmatico was not responsible for the alleged improper discharge of the patient on July 28, as he only approved his discharge from a "surgical standpoint" – which the expert opines was appropriate – and the decision to discharge was ultimately made by the cardiologist and attending physician.

On the issue of proximate causation, Dr. Persico states that the patient "did not suffer a laceration of his liver in the sense that his liver was cut or lacerated with a surgical instrument," but rather, he experienced a hematoma complication after the surgery which ultimately caused bleeding *within* the liver. He bases this on the language used by Dr. Nio and Dr. Sarpel in their operative reports at Mount Sinai Morningside and their deposition testimony, as well as his review of the post-operative records. He opines that if there had been a true

5

laceration of the liver during the July 24 surgery, "it would have bled immediately" and this bleeding would have been noticed during the procedure or obvious from his lab work and symptoms following the surgery. He opines that the patient's "benign post-op course," including the lack of gross blood in his Jackson-Pratt drain, his "stable blood counts," and the lack of "extreme pain," evince that he did not have an active bleed from a liver laceration during the surgery, but a subcapsular liver hematoma which subsequently bled.

Dr. Persico opines that the type of subcapsular hematoma developed by the patient "is not the result of poor surgical technique" but a potential complication of the surgery, and the risk was increased by the use of Plavix and aspirin during his recovery. Therefore, Dr. Persico opines that there was no negligence in the performance of the July 24 surgery which proximately caused the hematoma, nor were there any departures from the standard of care in his post-operative treatment and July 28 discharge. Dr. Persico also opines that a subsequent gastrointestinal bleed for which the patient was readmitted to Mount Sinai Morningside on August 14 was "due to his being on Plavix" and had "no relationship to his liver injury."

Finally, the expert notes that "Mr. Collazo signed a surgical consent" after being advised by Dr. Gulmatico of the risks, as well as having a discussion of the risks associated with anesthesia, and therefore Dr. Gulmatico seeks to dismiss the informed consent cause of action. Plaintiffs do not oppose this branch of the motion.

Dr. Gulmatico has established prima facie entitlement to summary judgment in his favor by submitting an expert affirmation setting forth, based on the record, that Dr. Gulmatico did not depart from the standard of care in the cholecystectomy, and that the post-operative bleeding in Mr. Collazo's liver was a rare complication that was not proximately caused by surgical error or negligence. The burden therefore shifts to Plaintiffs to raise an issue of fact.

In opposition, Plaintiffs submit an expert affirmation from a licensed physician certified in surgery (name of expert redacted), who affirms that they have "performed thousands of laparoscopic cholecystectomy procedures" and "managed the pre- and post-operative care of such patients, including hemorrhagic complications." Plaintiffs also submit an expert affirmation from a licensed physician (name of expert redacted), certified in cardiovascular diseases and nuclear cardiology.

6

[* 6]

Contrary to Dr. Gulmatico's argument in reply, a plaintiff may submit an expert affirmation where the affiant's name and signature have been publicly redacted but were made available to the court for *in camera* inspection. "A redacted physician's affirmation should not be considered in opposition to a motion for summary judgment where the plaintiff does not offer an explanation for the failure to identify the expert by name and does not tender an unredacted affirmation for in camera review" (*Richter v Menocal,* 216 AD3d 823, 824 [2d Dept 2023]). Here, Plaintiffs have submitted the signed, unredacted original copies of the affirmations for *in camera* inspection, but have redacted the affirmations to the opposing party and public to protect the identity of said experts, as they are permitted not to disclose them at this stage under CPLR 3101 (d)(1)(i) (*see Turi v Birk,* 118 AD3d 979, 980 [2d Dept 2014]; *McCarty v Community Hosp. of Glen Cove,* 203 AD2d 432 [2d Dept 1994]). The experts have also laid a proper foundation of their background and qualifications to opine on the alleged malpractice at issue. Therefore, this Court shall consider Plaintiffs' expert affirmations.

Based on their review of the record and relevant expertise, Plaintiffs' surgical expert opines that a laceration to the patient's liver was caused by a failure to "properly identify and protect the organs during dissection of the gallbladder off the liver bed and lysis of adhesions" during the July 24 cholecystectomy. The expert opines that Dr. Gulmatico, as primary surgeon, was responsible for all decisions and aspects of the surgery.

The surgical expert opines that the operative report and subsequent signs of bleeding suggest that the laceration occurred when Dr. Gulmatico and assisting surgeon Dr. Godoy encountered the gallbladder covered with omentum, used "blunt and sharp dissection" to remove the gallbladder from the liver bed, and observed bleeding in the area of the liver bed which he reported was cauterized.

The expert disagrees with Dr. Persico's analysis that Mr. Collazo had only a subcapsular hematoma – a rare but non-negligent complication of the surgery – and not a "true" laceration. Plaintiffs' expert notes that the post-operative diagnosis from the patient's subsequent surgery at Mount Sinai Morningside was "intrabdominal hemorrhage, liver laceration." The operative report of Dr. Nio read "Upon evacuation of the subcapsular hematoma, there was a liver laceration with active bleeding," and in an operative note opined that the laceration was "sustained likely during his laparoscopic cholecystectomy." Plaintiffs' expert interprets the record to show

7

that the patient had a subcapsular hematoma *and* grade III laceration, and the expert further opines that "these types of injuries to the liver do not occur in the absence of negligence." The expert opines that Dr. Gulmatico departed from the standard of care by not noticing and repairing an intraoperative laceration.

The expert further states that a subcapsular hematoma in segment VI of the liver alone "is not an acceptable risk and does not occur in the absence of negligence," opining that this injury would be caused by blunt trauma or too much pressure on the liver.

Additionally, the expert opines that Dr. Gulmatico departed from accepted standards of care by allegedly failing to monitor and evaluate the patient's blood work for signs of active bleeding before he was discharged from Mount Sinai Brooklyn. The expert notes that there was a "significant drop" in his H&H values on July 28, the same day he was discharged, from 11.5 / 37.8 the day before to 9.9 / 30.9 at 4:35 a.m. The expert opines this drop in hematocrit equates to losing "approximately 2-3 units of blood," and this required additional hospitalization in accordance with the standard of care.

Finally, the expert opines that Dr. Gulmatico failed to appreciate other clinical findings including the amount of serosanguinous fluid in the Jackson-Pratt drain, which the expert opines "was not within the normal range" (30cc the evening of July 24, 50ml of drainage over 12 hours on July 25, and 30cc within 24 hours on July 27). The expert opines, contrary to Dr. Gulmatico's note that there was "minimal" drainage, these findings may indicate post-surgical bleeding, and the standard of care would be to perform an abdominal CT scan and ultrasound in these circumstances. The expert also opines that pain, abdominal distention, and tenderness were repeatedly noted in the patient's chart by nurses and physicians on July 25, 26, 27, and 28. The expert opines that these symptoms warranted an abdominal CT scan to rule out "surgical complication and/or bleeding," and not to perform this test was a departure from the standard of care.

Plaintiffs' cardiology expert also opines that the H&H levels on the morning of July 28 constituted a "significant drop" that should have been appreciated by Dr. Gulmatico and other Mount Sinai Brooklyn staff. The cardiology expert opines that as the primary surgeon, Dr. Gulmatico "had the responsibility to review the patient's chart, be aware of the most recent laboratory values prior to discharge, communicate with the other treating

8

[* 8]

physicians, and ultimately make the decision whether to discharge the patient."

In reply, Dr. Gulmatico submits a supplemental affirmation from the expert Dr. Persico, further addressing Plaintiff's expert opinions on the patient's post-operative condition and whether it was within normal/stable range prior to his discharge, addressing the H&H levels, serosanguinous drainage, and tenderness/distention.

Plaintiffs' experts raise issues of fact as to whether Dr. Gulmatico departed from the standard of care in performance of the July 24 surgery and whether those departures proximately caused a laceration to the patient's liver and a subcapsular hematoma in the liver, resulting in a bleed, reparative surgery, and further complications. Both parties argue that the other's surgical expert mischaracterizes the "laceration" injury to the patient's liver and its source. "When experts offer conflicting opinions, a credibility question is presented requiring a jury's resolution" (*Stewart v. North Shore University Hospital at Syosset*, 204 AD3d 858, 860 [2d Dept. 2022], citing *Russell v. Garafalo,* 189 A.D.3d 1100, 1102 [2d Dept. 2020]). Plaintiffs' expert also raises issues of fact as to whether Dr. Gulmatico departed from the standard of care by failing to closely monitor or appreciate post-operative symptoms, including abdominal pain and distention, and order radiological tests before recommending the patient was ready for discharge from a "surgical standpoint."

The Court notes that new arguments and evidence raised in reply are generally improper in a summary judgment motion, unless responding to a new theory raised by the plaintiff (*see generally Gelaj v Gelaj,* 164 AD3d 878 [2d Dept 2018]; *Feliciano v New York City Health and Hospitals Corp.,* 62 AD3d 537, 538 [1st Dept 2009]). The opinions of Plaintiffs' experts with regard to the patient's post-operative clinical findings and the appropriateness of his discharge could have been anticipated from the bill of particulars. Further, the expert already opined generally in the initial supporting papers that the patient was not improperly discharged. In any case, the conflicting opinions of the experts only further establish that there are issues of fact which preclude summary judgment.

Notwithstanding the above, Plaintiffs raise no issues of fact on the issue of informed consent and they do not oppose the part of the motion seeking to dismiss the informed consent claim. Accordingly, Dr. Gulmatico's motion is granted to the extent of dismissing the informed consent claim only, and the motion is otherwise denied.

9

[* 9]

Additionally, to the extent that Plaintiffs' experts opine on Dr. Gulmatico's role in Mr. Collazo's readmission to Mount Sinai Brooklyn on July 29 and the alleged delays in diagnosing an active bleed or transferring him to Mount Sinai Morningside, Plaintiffs asserted no claims related to this treatment period in the bill of particulars, nor were they addressed in Dr. Gulmatico's moving papers. The Court therefore does not make any ruling on these claims.

Turning to the motion of assistant surgeon Dr. Godoy and Mount Sinai Brooklyn (Seq. No. 4), the movants submit an expert affirmation from Dan S. Reiner, M.D. ("Dr. Reiner"). Dr. Reiner sets forth that he is a licensed physician certified in general surgery and affirms he has training and experience in performing laparoscopic and open cholecystectomies.

Based on the record, Dr. Reiner opines that there were no departures from the standard of care from Dr. Godoy in performance of the July 24 surgery, nor any departures from other Mount Sinai Brooklyn staff[1] in the pre- or post-operative care of the patient through his discharge on July 28.

On the claims against Dr. Godoy, Dr. Reiner opines that his surgical assistance during the July 24 laparoscopic cholecystectomy was in accordance with the standard of care. Dr. Reiner notes that it is undisputed in the record that Dr. Gulmatico was the primary surgeon in the July 24 procedure, and Dr. Godoy was a "house surgeon" (not resident) at Mount Sinai Brooklyn who was asked to assist. Dr. Godoy was not involved in any other pre- or post-operative treatment of the patient. Dr. Reiner opines that Dr. Gulmatico was responsible for performance, supervision, and any intraoperative decisions, and further opines there is no evidence that Dr. Godoy acted with independent negligence. Dr. Reiner opines that the surgery was "carried out entirely routinely and appropriately," and that the adhesions around the gallbladder were dissected "using known and accepted techniques" as detailed in the operative report. He also opines that the cauterized bleed during surgery was "minimal" (50-60 cc's of blood loss). The expert notes that Dr. Godoy placed two of the trocars ("a long thin

---

[1] As stated in a footnote in their moving papers, all references made to Mount Sinai Brooklyn "staff" are shorthand for "doctors, physician assistants, nurses and other medical staff, *other than Dr. Godoy and codefendant Dr. Gulmatico*" (Dr. Reiner affirmation, at 4 [emphasis added]). This includes non-party physicians Dr. Paiusco (cardiologist) and Dr. Balikcioglu (gastroenterologist and attending physician). The movants do not clarify their employer/employee relationship but make no argument that they are not liable for alleged acts and omissions of said physicians.

10

[* 10]

device to which the cameras and surgical instruments are attached") and he also "held graspers, provided exposure, maneuvered the camera and held sutures." He opines that none of these actions "could or did cause a laceration of the liver or liver vessels."

On the issue of proximate causation, Dr. Reiner expresses a similar opinion to the co-defendant's expert, Dr. Persico, that the alleged "liver laceration" was not actually an injury to the "external capsule of the liver" which occurred during the July 24 surgery. Rather, he opines that the Mount Sinai Morningside surgeons were describing "bleeding from a hepatic vein within the liver," which is "a known but rare complication of cholecystectomy believed to result from the needed, and proper, dissection and removal of the gallbladder from the liver bed." He opines that in most cases this bleeding would stop on its own, but in some cases the patient develops a hematoma, as seen in the patient here. Therefore, he opines that the patient's claimed injuries were not caused by any departures from the standard of care, and the patient's hematoma was a rare complication which developed after his surgery despite proper treatment.

Based on the submissions, Dr. Godoy has established prima facie entitlement to summary judgment on behalf of Dr. Godoy, shifting the burden to Plaintiffs to raise an issue of fact. They establish in detail that, in the opinion of their medical expert, the July 24 surgery was performed within accepted medical standards, and Dr. Godoy did not proximately cause a subcapsular hematoma or laceration in his role as an assistant surgeon.

As to the other staff at Mount Sinai Brooklyn, Dr. Reiner opines that the patient was appropriately monitored and treated post-operatively, and updates to his status were communicated to Dr. Gulmatico through the hospital's electronic records system. Dr. Reiner opines that the patient had "very little output" in his Jackson-Pratt drain which indicated no obvious bleeding, and that his complaints of pain, tenderness, and abdominal distention were common for post-operative patients and had resolved by the time of his discharge. Dr. Reiner opines that the patient's H&H levels were slightly lower but "essentially stable" from the time after his surgery to July 27, and opines that the decrease was attributable to "normal intra-operative blood loss" and the fluids and medications he was receiving. Dr. Reiner further opines that the July 28 decrease in his H&H, while greater than the previous drop, was still "considered stable" for a post-operative patient.

11

Dr. Reiner opines that the Mount Sinai Brooklyn cardiology consult Dr. Paiusco, who examined the patient on July 28, did not depart from the standard of care in clearing him for discharge, as his "cardiology findings were similar" to his status before the procedure. He also opines that the attending physician, Dr. Balikcioglu, appropriately relied on Dr. Gulmatico and Dr. Paiusco's evaluations and discharged the patient. He opines that the ultimate decision to discharge him "belonged to Dr. Gulmatico, who was following the patient post-operatively."

Dr. Reiner further opines without detail that the alleged improper discharge was not a proximate cause of the patient's injuries, because it would not have changed the course of his complications and treatment.

Mount Sinai Brooklyn's expert has established prima facie entitlement to summary judgment on the issue of compliance with the standard of care, with respect to direct claims against the hospital staff. The expert sets forth his opinion based on the record that the patient had a normal and non-concerning post-operative course with respect to his H&H levels, Jackson-Pratt drainage, and complaints of distention and tenderness, and that it was not a departure from the standard of care to discharge him from the hospital on July 28. The burden therefore shifts to Plaintiffs to raise a triable issue of fact on these claims.

Notwithstanding this, the expert's opinion that the alleged improper discharge was not a *proximate cause* of injury and would not have changed the outcome is conclusory and unsupported by evidence in the record. Therefore, the Plaintiffs need not rebut the issue of proximate causation in opposition.

In opposition to the MSB Defendants' motion, Plaintiffs submit the same affirmations from their surgical expert and cardiology expert, which were presented to the Court for *in camera* inspection.

Plaintiffs' surgical expert opines, based on the operative reports and the physicians' testimony, that Dr. Godoy was an "active participant" not only using trocars and graspers during the cholecystectomy but also transecting the adhesions when the patient's gallbladder was covered by omentum. As such, the expert opines there is an issue of fact as to whether Dr. Godoy or Dr. Gulmatico directly lacerated the liver. Further, Plaintiffs' expert opines that the alleged separate injury of a subcapsular hematoma (which the defendants argue was the only complication) would not happen without applying "excessive force" with graspers, and thus the

12

surgeon applying that force departed from the standard of care and caused blunt trauma to the patient which proximately caused the hematoma.

Plaintiffs raise issues of fact with respect to Dr. Godoy, offering a conflicting expert opinion as to the type of liver injury and probable mechanism of that injury, which must be resolved by a trier of fact. While an assistant surgeon is generally not liable for following the decisions made by the primary or lead surgeon (*see generally Pol v Our Lady of Mercy Medical Center,* 51 AD3d 430 [1st Dept 2008]), there remain issues of fact, supported by the Plaintiffs' surgical expert opinion, as to whether Dr. Godoy directly caused a laceration to the patient's liver in his capacity placing the trocars and assisting in removing adhesions, as well as whether Dr. Godoy caused the patient's hematoma by using excessive force with the graspers. These issues of fact related to alleged departures from the standard of care preclude summary judgment in favor of Dr. Godoy. Accordingly, the branch of the motion seeking summary judgment for Dr. Godoy is denied.

Turning to the direct claims against Mount Sinai Brooklyn, Plaintiffs' surgical expert opines that the patient's physicians, nurses, and physician's assistants departed from the standard of care by failing to appreciate or communicate with each other on the patient's abnormal symptoms and blood work. As discussed above in Dr. Gulmatico's motion, Plaintiffs' expert opines in detail that the patient exhibited an abnormal amount of serosanguinous drainage, distention, pain, and tenderness, and decreased H&H levels, particularly a significant drop on July 28 prior to his discharge.

The surgical expert opines that the Mount Sinai Brooklyn cardiologist, Dr. Paiusco, specifically departed from the standard of care by failing to appreciate the patient's H&H drop after restarting him on Plavix, and by clearing the patient for discharge from a cardiology standpoint on July 28 despite this evidence of blood loss.

Plaintiffs' cardiology expert additionally opines that Dr. Paiusco departed from the standard of care by failing to note the patient's significant H&H drop when evaluating him on July 28 and by recommending that he could be discharged from a cardiology standpoint. The expert opines that this discharge proximately caused the patient's delayed diagnosis of an active bleed, leading to hemorrhagic shock, his hemodynamic instability during further surgeries, and his myocardial infarction.

13

Both experts also note that the attending physician, Dr. Balikcioglu, documented and signed the plan to discharge Mr. Collazo on July 28. The expert opines that he departed from the standard of care by failing to properly communicate with other providers and physicians' assistants and appreciate his H&H drop and other symptoms.

Plaintiffs have raised issues of fact as to the role of attending physician Dr. Balikcioglu and cardiologist Dr. Paiusco in the patient's discharge. Plaintiffs' experts opine that there were symptoms that warranted further monitoring and radiological studies to rule out a post-operative bleed, which should have been appreciated by these physicians on July 28 before he was discharged. The conflict between the experts' opinions on whether the patient's July 28 blood labs should have prevented him from being discharged in accordance with the standard of care creates an issue of fact that must be resolved by a jury.

The moving defendants failed to meet their prima facie burden on the issue of proximate causation, regarding the post-operative monitoring and discharge claims against the hospital, because their expert merely stated without detail that the patient's discharge had no impact on his course of treatment. Notwithstanding, Plaintiffs raise an issue of fact as to proximate causation, as their experts opine that the alleged delay in diagnosis and improper July 28 discharge was a proximate cause of the patient's claimed injuries.

As previously stated with respect to Dr. Gulmatico's motion, Plaintiffs' bill of particulars did not assert any claims or theories of liability related to the patient's readmission to Mount Sinai Brooklyn on July 29. However, this readmission was briefly addressed by the movants' expert, who opined in a conclusory fashion that the patient was "promptly and properly evaluated" and "properly and timely transferred" to Mount Sinai Morningside. To the extent these claims were addressed with little detail in the supporting and opposition papers, the Court does not rule at this time on whether those claims are viable.

Furthermore, Mount Sinai Brooklyn failed to meet their prima facie burden with respect to vicarious liability for the acts and omissions of co-defendant Dr. Gulmatico. In fact, the movants only briefly address this issue, setting forth in their attorney affirmation a single statement that "Mr. Collazo was a patient of [Dr.

14

[* 14]

Gulmatico's] private practice when treated" at Mount Sinai Brooklyn, and they proceed to place responsibility on Dr. Gulmatico for decisions regarding the patient's post-operative treatment and discharge.

It is well established that a hospital is generally liable only for its employees under the doctrine of *respondeat superior*. "However, an exception to this general rule exists where a plaintiff seeks to hold a hospital vicariously liable for the alleged malpractice of an attending physician who is not its employee where a patient comes to the emergency room seeking treatment from the hospital and not from a particular physician of the patient's choosing" (*Fuessel v Chin,* 179 AD3d 899, 901 [2d Dept 2020], citing *Muslim v Horizon Med. Group, P.C.,* 118 AD3d 681 [2d Dept 2014]). This long-held exception was set forth in *Mduba v Benedictine Hosp.* (52 AD2d 450 [3d Dept 1976]), where the court held that a hospital is vicariously liable for the acts and omissions of a physician it provided to the patient, "having held itself out to the public as an institution furnishing doctors, staff and facilities for emergency treatment" (*id.,* at 454). Thus, a hospital seeking summary judgment must demonstrate that the physician alleged to have committed malpractice was an independent contractor *and* that this exception to the general rule did not apply.

The hospital has not done so here. Dr. Gulmatico testified that he was an "independent practitioner" with admitting privileges at the hospital at the time of the surgery. However, his relationship to the patient was entirely limited to the surgery itself and post-operative care at the hospital. Dr. Gulmatico testified in his deposition that Mr. Collazo was not an existing patient of his, but he "became a patient of mine" after he presented at Mount Sinai Brooklyn with "abdominal pain, fever and nausea." The patient and his spouse/co-plaintiff Amelia Collazo also testified that they had never met the surgeon, Dr. Gulmatico, prior to Mr. Collazo's admission to Mount Sinai Brooklyn. The record indicates that Mr. Collazo was not referred to or admitted to the hospital as a private patient of Dr. Gulmatico, but rather, he presented without a private surgeon to the emergency department and was furnished an appropriate specialist *by* the hospital.

As a matter of law, Mount Sinai Brooklyn has failed to demonstrate that they are not liable for the acts of Dr. Gulmatico, regardless of his status as an employee or independent contractor, as they have not shown Mr. Collazo presented at the hospital "seeking treatment from a privately selected physician rather than from the

15

[* 15]

hospital itself" (*see Fuessel,* at 901-902, citing *Mduba,* 52 AD2d 450). For this reason, summary judgment must be denied as to any vicarious liability claims against the hospital for the acts and omissions of Dr. Gulmatico.

The motion is also denied with respect to vicarious liability claims against Mount Sinai Brooklyn for the acts of employees and staff including cardiologist Dr. Paiusco and attending physician Dr. Balikcioglu, as Plaintiffs have raised triable issues of fact as to liability.

Notwithstanding the above, the movants' experts opine that there is no merit to the informed consent claims against Mount Sinai Brooklyn, as the risks were appropriately communicated to the patient and consent was obtained, and there is also no evidence to support a negligent hiring claim. Plaintiffs submit no opposition to this part of the motion. Accordingly, the branch of the motion seeking summary judgment and dismissal of the claims for lack of informed consent and negligent hiring, only, is granted without opposition.

In support of the Morningside Defendants' motion for summary judgment (Seq. No. 5), the movants submit an expert affirmation from Michael D. Kluger, M.D. ("Dr. Kluger"), a licensed physician certified in surgery and fundamentals of laparoscopic surgery. The movants also submit an expert affirmation from Edward Katz, M.D. ("Dr. Katz"), a licensed physician certified in internal medicine and cardiovascular diseases.

Based on the record, Dr. Kluger opines that there were no departures from the standard of care from Dr. Sarpel, Dr. Nio, or any other physicians or personnel at Mount Sinai Morningside in treating the patient. He notes that the patient arrived at Mount Sinai Morningside on the evening of July 29 was admitted to the ICU at approximately 8:30 p.m. Dr. Nio performed a surgical consult and reviewed the CT scan which had been performed at Mount Sinai Brooklyn. Dr. Kluger opines that ordering serial blood counts was appropriate within the standard of care, as was the plan to closely monitor the patient and "try to stabilize Mr. Collazo overnight with blood products" rather than proceed immediately to surgery. Dr. Kluger opines that the CT scan and angiogram performed earlier that day at Mount Sinai Brooklyn "did not show active bleeding," and given the risks associated with surgery, it was reasonable to attempt to stabilize the patient, as it was possible he could "eventually reabsorb a hematoma thus avoiding surgical intervention." The expert opines that Dr. Nio

16

[* 16]

appropriately proceeded to exploratory surgery on July 30, with consent from Mr. Collazo, based on declining status of his hematocrit and transaminitis.

Dr. Kluger further opines, based on the operative reports, that the surgery was performed in accordance with the standard of care. Dr. Nio began a diagnostic laparoscopy which was converted to a laparotomy after discovery of a large amount of bleeding. Dr. Sarpel, a liver specialist previously consulted by Dr. Nio, took over the surgery once the injury to the liver became apparent. Dr. Kluger explains that Dr. Sarpel deroofed/surgically removed the hematoma and utilized a Pringle maneuver, applying a clamp to minimize blood loss, which Dr. Kluger opines was the standard of care and a course of action with "no alternative." At that time, the patient became hypotensive and needed to be resuscitated; Dr. Kluger opines that the decision to temporarily stop the surgery, place a temporary dressing, and transfer him to the SICU was "proper in all respects."

After stabilization, Dr. Kluger opines that the final July 31 surgery performed by Dr. Nio, in which the bleeding from segment six of the liver was cauterized and his abdomen was closed, was performed within the standard of care, and there were no departures from acceptable standards in his post-operative treatment and discharge.

On the issue of proximate causation, Dr. Kluger opines without detail that Mr. Collazo's blood loss and shock "were unavoidable once he was transferred" to Mount Sinai Morningside, and that earlier surgical intervention would not have altered this outcome.

Dr. Kluger notes that the patient returned to Mount Sinai Morningside on August 14, shortly after his discharge, with "bright red blood from his rectum after a bowel movement." He received additional treatment for this condition through August 20, including a colonoscopy, which revealed an ulcer in the transverse colon. Dr. Kluger opines this condition and treatment was related to his "preexisting history of gastrointestinal bleeding and the required treatment with dual antiplatelet therapy," and it was unconnected in any way to the surgeries performed by Dr. Sarpel and Dr. Nio.

Additionally, the movant's cardiology expert, Dr. Katz, opines that discontinuance of the patient's dual antiplatelet therapy (aspirin and Plavix) in his initial evaluation at Mount Sinai Morningside was in accordance

17

with the standard of care, due to the patient's "urgent situation of life-threatening bleeding." Dr. Katz also opines that the standard of care did not require obtaining a cardiology consultation prior to the patient's surgery on July 30, because "at the time the decision was made to consider surgery, Mr. Collazo's surgery was emergent." Dr. Katz also opines that the only recommendation a cardiologist would have made in this position would have been to halt his blood-thinner medication – Plavix and aspirin – which was already being done, and therefore a consultation would not have altered his course of treatment.

Dr. Katz also opines based on the record that at most a type II myocardial infarction (which would "inflict less damage on the heart" than a type I myocardial infarction) occurred during the surgery, and the expert opines this was the result of his "unavoidable and unpreventable" amount of blood loss, hypotension, and hemodynamic instability, not any deviations from the standard of care from Mount Sinai Morningside.

Based on the submissions, the Morningside Defendants have established prima facie entitlement to summary judgment, setting forth in their experts' opinions that there were no departures from the standard of care in the performance of the July 30 and July 31 surgeries, nor in his pre- or post-operative care. To the extent that a derivative "loss of services" claim cannot survive in the absence of medical malpractice, they also meet their prima facie burden to dismiss co-plaintiff Amelia Collazo's cause of action. However, the expert's opinions on proximate causation are conclusory and do not establish prima facie that earlier surgical intervention would not have altered the patient's outcome.

In opposition, Plaintiffs submit an expert affirmation from their licensed surgeon and cardiologist, (names of experts redacted). As previously discussed, these expert's names and signatures were submitted to the Court for *in camera* inspection, and they have established their qualifications to opine on the facts at issue.

Based on the records and their relevant expertise, Plaintiffs' surgery expert opines Mount Sinai Morningside, through its physicians including Dr. Nio and Dr. Sarpel, departed from the standard of care by failing to timely diagnose the patient's liver injury and delaying the laparotomy to identify and repair the source of bleeding. The expert notes that the patient had first presented to Mount Sinai Brooklyn the morning of July 29, and he was transferred to Mount Sinai Morningside approximately twelve hours later at 8:43 p.m. with "acute

18

blood loss, anemia, hemorrhagic shock secondary to hemoperitoneum (bleeding within the abdominal cavity) in setting of recent laparoscopic cholecystectomy, transaminitis likely in setting of shock liver, and leukocytosis likely in setting of hemoperitoneum."

Dr. Nio signed off on a plan of treatment to discontinue Plavix, monitor his H&H and vitals, and order exploratory surgery if needed. Plaintiffs' expert opines, however, that this was insufficient and a departure from the standard of care. In the expert's opinion, all evidence pointed to an "active abdominal bleed," including his CT scan from Mount Sinai Brooklyn and "continued anemia despite three blood transfusions" with abnormally low H&H levels. Although those levels moderately improved at 9:47 p.m. (9.7 / 29), the expert opines these numbers still suggested a bleed and the improvement was only temporary. The expert opines that the fact his angiogram from Mount Sinai Brooklyn did not locate the source of bleeding did not rule out an active bleed. The expert counters Dr. Kluger's opinion that it was reasonable for Dr. Nio to try to stabilize him overnight simply because it is "possible" to reabsorb a hematoma, opining that the standard of care "required urgent surgical intervention as opposed to continued monitoring and blood transfusions," particularly in light of the fact he had already been hospitalized at Mount Sinai Brooklyn since that morning and his condition had failed to improve. Further, the expert notes that another H&H drop occurred at 1:20 a.m. (9.2 / 27.2), but it was still approximately 13 hours before the patient received surgery, despite these declining H&H levels being noted in Dr. Nio's decision to proceed to surgery. The expert opines that more timely surgical intervention was required by the standard of care.

Plaintiffs' expert further opines that given the evidence of an active bleed, it was a departure from the standard of care for Dr. Nio to begin with an exploratory laparoscopy rather an open laparotomy, which the surgery was then converted to. The expert opines the initial choice to perform a laparoscopy was "time-wasting" and a proximate cause of Mr. Collazo's continued hemorrhage and hemodynamic instability.

On Dr. Sarpel, Plaintiffs' expert opines that, based on her testimony that she had been contacted about the patient by Mount Sinai Brooklyn's attending physician Dr. Balikcioglu prior to his arrival, she should have taken a more active role in his monitoring and treatment and evaluated him when he presented to Mount Sinai

19

[* 19]

Morningside. The expert also opines that, as a liver specialist (hepatobiliary surgeon), she should have "been involved from the beginning of the surgery" rather than relying on general/trauma surgeon Dr. Nio and being "called in to assist" and taking over once the liver injury and subcapsular hematoma were identified. The expert opines without detail that Plaintiffs' complications would have been avoided if she had been the primary surgeon from the start.

Further, Plaintiffs' cardiovascular expert opines that it was a departure from the standard of care to delay the patient's surgical intervention from his arrival on July 29 at 8:43 p.m. until the following day at 2:26 p.m. Upon his transfer to Mount Sinai Morningside, the expert notes that he had "acute blood loss, anemia, hemorrhagic shock due to bleeding within the peritoneal cavity, transaminitis and leukocytosis," and his CT scan form 10:00 a.m. that morning at Mount Sinai Brooklyn was "suspicious for active bleeding."

The cardiovascular expert also opines, based on the patient's elevated troponin levels, that he had a type II myocardial infarction resulting from his bleed, anemia, and hypotension. The expert opines that he would not have had this type II myocardial infarction if the laceration to the liver had been diagnosed and an exploratory surgery performed sooner at Mount Sinai Morningside.

Plaintiffs have raised issues of fact with respect to the alleged delay in surgical intervention from Dr. Nio and Mount Sinai Morningside. The experts offer conflicting opinions on whether the patient's presentation in the ICU, his prior CT scan and angiogram (indicating or merely "suspicious" for an active bleed), and his H&H levels demonstrated an active bleed that required immediate surgical intervention, or whether the course of action to monitor him overnight and perform the surgery the following day was reasonable. Additionally, Plaintiffs' expert raises a conflicting opinion – and therefore a triable issue of fact – as to whether Dr. Nio departed from the standard of care by opting to begin with a laparoscopic procedure prior to the laparotomy. Accordingly, the issues of the patient's pre-operative care and the timeliness of the laparotomy must be resolved by a trier of fact, and summary judgment in favor of Mount Sinai Morningside and Dr. Nio is denied.

Notwithstanding, Plaintiffs raise no opposition as to any informed consent or negligent hiring claims against the hospital, nor any claims regarding the patient's July 31 surgery, post-operative care, or his subsequent

20

[* 20]

hospitalization after August 14.

Additionally, Plaintiffs fail to raise a triable issue of fact with respect to any acts or omissions of Dr. Sarpel. Although Dr. Sarpel testified that she was made aware of the patient's case due to the possibility of a liver injury, and she was asked to assist and potentially take over the July 30 surgery, there is nothing in the record demonstrating she had any decision-making authority with respect to the timing of the surgery or monitoring of the patient prior to July 30. Further, contrary to the statements made by the Plaintiffs' surgical expert that she should have been "involved" from the start of the surgery, Dr. Sarpel's testimony and operative reports state that she was present for the surgery, but only took the lead as primary surgeon for the open laparotomy portion and deroofing of the hematoma. Plaintiffs do not point to any specific errors or departures from the standard of care made during the surgery that would have been avoided by Dr. Sarpel having the primary surgeon role. Plaintiffs also do not raise any issues of fact regarding the open laparotomy portion of the procedure performed by Dr. Sarpel on July 30, and they do not assert any claim that her actions after taking over as primary surgeon were a cause of the patient's liver laceration, hemodynamic instability, and/or myocardial infarction.

Additionally, Plaintiffs' arguments as to causation – stating that the patient's complications would have been "more likely" avoided if Dr. Sarpel was involved earlier – are conclusory and speculative, and therefore cannot defeat the defendant's prima facie case for summary judgment in favor of Dr. Sarpel.

As the causes of action sounding in medical malpractice against Dr. Sarpel is hereby dismissed, the derivative claims of co-plaintiff Amelia Collazo are also dismissed as to defendant Dr. Sarpel only.

Lastly, this Court does not consider surreply papers including letters to the court in consideration of a motion, in accordance with the Part Rules and CPLR 2214. The First Department case cited by defendants, which was decided before time to reply had expired, is not wholly analogous to this matter nor binding on this Court.

Accordingly, it is hereby:

**ORDERED** that Dr. Gulmatico's motion (Seq. No. 3) for an Order, pursuant to CPLR 3212, granting summary judgment in his favor, is **GRANTED TO THE EXTENT** of dismissing Plaintiffs' claims for lack of informed consent, and the motion is otherwise **DENIED;** and it is further

21

[* 21]

INDEX NO. 505790/2021
RECEIVED NYSCEF: 09/04/2024

**ORDERED** that Dr. Godoy and Mount Sinai Brooklyn's motion (Seq. No. 4) for an Order, pursuant to CPLR 3212, granting summary judgment in his favor, is **GRANTED TO THE EXTENT** of dismissing Plaintiff's claims for lack of informed consent and negligent hiring, and the motion is otherwise **DENIED;** and it is further

**ORDERED** that Dr. Sarpel, Dr. Nio, and Mount Sinai Morningside's motion (Seq. No. 5) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor, is **GRANTED TO THE EXTENT** of dismissing Plaintiffs' complaint against Dr. Sarpel in its entirety, and dismissing any lack of informed consent and negligent hiring claims against Dr. Nio and Mount Sinai Morningside, and the motion is otherwise **DENIED.**

The Clerk shall enter judgment in favor of UMUT SARPEL, M.D.

This constitutes the decision and order of this Court.

**ENTER.**

_____

**Hon. Consuelo Mallafre Melendez**

**J.S.C.**

22

[* 22]